FILED

SEP - 6 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK ACCOUNTS:

1.  Account ID: 100012828217918, User
    Name: martel.joffrion
2.  Account ID: 100056185143046, User
    Name: dom.odom.509
3.  Account ID: 100008636740057, User
    Name: stephenallan.williams.5

THAT ARE STORED AT PREMISES
CONTROLLED BY META PLATFORMS,
INC.

Case No. 4:24-sw-117

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

**INTRODUCTION AND AGENT BACKGROUND**

I, Zachary Mullin, being first duly sworn, hereby depose and state:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 2024. That is, I am an officer of the United States, who is empowered by law to conduct investigations regarding violations of United States law, to execute warrants issued under the authority of the United States, and to make arrests of those offenses, as enumerated in Title 18, United States Code, § 3052. Prior to my employment with the FBI, I served as an infantryman in the United States Army for five years. I am currently a member of the FBI Safe Streets Peninsula Task Force (SSPTF). In the course of my duties, I am responsible for investigating crimes that include, but are not limited to, violent crime, criminal organizations, white collar crime, crimes against children, and robberies. Since joining the FBI, your Affiant has received specialized training in criminal investigations, identifying and seizing electronic evidence, recovery, and social media website investigations. Your Affiant is familiar with the methods by which criminals conduct their business, including but not limited to, their use of telephones and other electronic applications or "apps" in an attempt to conduct and conceal their communications, the various means and methods by which criminals log and maintain ledgers and receipts associated with their schemes, both in hard copy as well as digitally.

2.  I have participated in cases and investigations related to violent crime, drug crime, white collar crime, and other violations. During these investigations, I have also performed duties associated with electronic surveillance including, but not limited to, conducting

physical surveillance, reviewing social media posts and other associated information, and using cell phone location data. Accordingly, I have become familiar with criminals' use of electronic communication devices, their patterns of activity, and the methods, language, and terms that are used by criminals to disguise their activities, and the source and nature of the profits they earn from their illegal activities.

3.    As a result of my training and experience, I am aware that criminals use cellphones, encrypted text communications applications, as well as social media platforms like Facebook, Instagram, and Snapchat to communicate with their coconspirators. In my training and experience, criminals often use cellphones that are not registered in or subscribed to their own names or addresses to avoid detection by law enforcement. In my training and experience, while individual cell phones may be replaced frequently due to either internal tradecraft or a law enforcement encounter, criminals are less likely to change their social media profiles. It has also been my training and experience that, because cellphones are ubiquitous, and normally kept in close proximity to the individual, cellphone usage can provide location information to law enforcement, and it provides a platform for the individual to access their social media accounts, as well as other electronic apps with regularity.

4.    Through my training and experience, I have become familiar with the manner in which criminals use phones, cellphone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, social media communications, and other means to facilitate their illegal activities and thwart law enforcement investigations.

5.    This Affidavit is based upon information that I have gained from my investigation, my training and experience, my review of documents and other evidence, and conversations with other law enforcement officers and other people. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations of recorded conversations (if any), are based on a review of audio recordings and draft transcripts.

6.    Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities (described in Attachment B) of violations of 18 U.S.C. § 2113 (bank robbery) and 18 U.S.C. § 371 (conspiracy) are within the information described below. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

7.    This Affidavit is made in support of an application for a search warrant for information associated with the following Facebook accounts ("**SUBJECT ACCOUNTS**"):

2

1) Account ID: 100012828217918, User Name: martel.joffrion
2) Account ID: 100056185143046, User Name: dom.odom.509
3) Account ID: 100008636740057, User Name: stephenallan.williams.5

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachments A and B. This Affidavit is made, in part, in support of an application for a search warrant under 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A) to require Meta to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

## LEGAL AUTHORITY

### A.    Pertinent Criminal Statutes

8.    This investigation concerns alleged violations of Title 18, United States Code, Section 2113, relating to bank robbery, and conspiracy to commit the same.

9.    Title 18, United States Code, Section 2113(a) provides:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

> Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—

> Shall be fined under this title or imprisoned not more than twenty years, or both.

10.    Title 18, United States Code, Section 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency

3

thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

**B.    Other Legal Authority**

11. The legal authority for this search warrant application regarding the Facebook accounts is derived from 18 U.S.C. §§ 2701–2713, entitled "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides in relevant part as follows:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure. . . . A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

12. Title 18, United States Code, Section 2703(b) provides in relevant part as follows:

> (1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –
>
> (A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure. . . .
>
> (2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service –
>
> (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and
>
> (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents

4

of any such communications for purposes of providing any services other than storage or computer processing.

13.    This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3).   18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A).   Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) ... that – has jurisdiction over the offense being investigated." *Id.* § 2711(3)(A)(i).

14.    This investigation involves offenses within the jurisdiction and proper venue of the United States District Court for the Eastern District of Virginia.

## TECHNICAL BACKGROUND/FACEBOOK

15.    Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.   Meta allows it users to establish accounts with Facebook, and users can then use their accounts to share written communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16.    Meta asks users to provide basic contact information to use Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Facebook also assigns a user identification number to each account.

17.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.   By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.   Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.   A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."   If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.   Each Facebook user's account includes a list of that user's

5

"Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

21. Facebook users can use Facebook Messenger to communicate with other users via private text, voice, and video. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and it also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

22. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

24. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos in which the user has been tagged, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The

activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

27.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

28.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

29.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these apps, an update about the user's access or use of that app may appear on the user's profile page.

30.    Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook also assigns a group identification number to each group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

31.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

32.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

33. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

34. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

35. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts, along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Lastly, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

8

consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

36.     Therefore, the servers of Meta are likely to contain all of the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## DEFINITIONS

37.     The terms "records," "documents," and "materials" include all information recorded in any form, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

    a.   graphic records or representations;
    b.   photographs;
    c.   pictures;
    d.   images;
    e.   aural records or representations; and
    f.   messages and communications.

38.     The terms "records," "documents," and "materials" include all of the foregoing, in whatever form and by whatever means the records, documents, or materials, and their drafts or their modifications, may have been created or stored, including (but not limited to): any electrical, electronic, or magnetic form (including but not limited to any information on an electronic or magnetic storage device such as hard disks).

39.     The term "computer" as used herein is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

40.     The term "Universal Resource Locator" (URL): A URL is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies the specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

41.     The term "Internet Protocol Address" (IP Address): This term refers to the fact that every computer or device on the Internet is referenced by a unique Internet Protocol address, the

9

same way every telephone has a unique telephone number. An example of an IP address is "192.168.10.102." Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. There are two types of IP addresses: static and dynamic. A static address is permanent and never changes, such as ones used in cable modems. The dynamic address changes almost every time the computer connects to the Internet.

42.    The term "Internet Service Provider" (ISPs): This term refers to individuals who have an Internet account and an Internet-based electronic mail (e-mail) address must have a subscription, membership, or affiliation with an organization or commercial service which provides access to the Internet. A provider of Internet access and services is referred to as an Internet Service Provider or "ISP."

43.    "Web hosts" provide the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Most hosting is "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a Website, the client needs a server and perhaps a web-hosting company to host it. "Dedicated hosting," means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security, and online technical support. Co-location facilities offer customers a secure place to physically house the customers' hardware and equipment, as opposed to keeping it in their offices or warehouse, where the potential for fire, theft, or vandalism is greater.

44.    "Electronic Communication Service" refers to any service that provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15).

45.    "Remote Computing Service" is a service that provides to the public computer storage or processing services by means of an "electronic communications system." *Id.* § 2711(2).

46.    "Electronic Communications System" means any wire, radio, electromagnetic, photo-optical, or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications. *Id.* § 2510(14).

47.    "Contents," when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication. *Id.* § 2510(8).

48.    "Electronic storage" means (a) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (b) any storage of

10

such communication by an electronic communication service for purposes of backup protection of such communication. *Id.* § 2510(17).

## PROBABLE CAUSE TO SEARCH

49.     On July 27, 2024, at approximately 1149 hours, officers with the Newport News Police Department (NNPD) were dispatched to Navy Federal Credit Union (NFCU) located at 12828 Jefferson Avenue, Newport News, VA, in reference to a robbery in progress. NFCU is a financial institution, as defined in 18 U.S.C. § 20, and a credit union, as defined in 18 U.S.C. § 2113(g). The accounts of NFCU were then insured by the National Credit Union Share Insurance Fund, administered by the National Credit Union Administration Board.

50.     At approximately 1148 hours, an individual, suspected to be Stephen Allan Williams, entered the bank, armed. He brandished a firearm at multiple tellers and stated that he wanted the large bills and to hurry up or he was going to shoot. The offender entered the business wearing a white pullover mask (balaclava) that only exposed his eyes, but he was also wearing sunglasses. He was wearing a long-sleeved blue shirt, blue jeans, and white shoes. When he entered the bank, he had a firearm in his right hand and a plastic bag in his left, which he used to collect the currency he demanded from the tellers. He exited the bank with approximately $5,000 inside of the plastic bag. The bundles of U.S. currency given to the perpetrator contained GPS tracking devices.

51.     An off-duty Norfolk police officer observed the offender enter the bank prior to the robbery and exit the bank afterwards. He further observed the path of travel taken by the offender. The officer observed a red vehicle leaving the area to which the offender had traveled, and he followed the red vehicle. The officer provided a description of the vehicle to NNPD dispatch and continued to follow the vehicle. The path of travel for this vehicle matched that of the GPS trackers placed in the money from the bank. The vehicle was identified as a 2013 Cadillac displaying the temporary license plate 33067R. The trackers from NFCU appeared to stop pinging in the area just south of Bland Boulevard and Jefferson Avenue.

52.     NNPD Officers observed the vehicle, located at 12515 Jefferson Avenue, Newport News, VA. The vehicle was occupied by three individuals. A high-risk traffic stop was conducted on the vehicle. An officer-involved shooting transpired at approximately 1158 hours with the rear passenger, later identified as Stephen Allan Williams (DOB: 10/09/1984). The driver was identified as Martel Lammond Joffrion (DOB: 02/24/1979), and the front passenger was identified as Dominique Shante Butts (DOB: 06/23/1990). Williams was pronounced deceased at Riverside Regional Medical Hospital at approximately 1305 hours.

53.     NNPD officers saw the following items in plain view in the red Cadillac driven by Joffrion: a license plate in the front passenger floorboard that displayed "TTM5170," verified as the correct license plate for the vehicle and found to be registered to Joffrion; cash and a plastic

11

bag in the rear passenger area; and two cell phones in the front middle area of the vehicle. DMV checks confirmed that the vehicle is owned by Joffrion.

54.    NNPD officers conducted an interview with Joffrion at Newport News Police Headquarters at approximately 1353 hours. Joffrion said he has known Williams for a long time, and they met in prison. Joffrion said Butts and Williams were at his house that morning, and Joffrion, with Butts, provided Williams a ride to his girlfriend's house in the Old Courthouse area. Joffrion said that he and Williams communicated via Facebook Messenger on his phone while they were both at his apartment, and that Williams had a "WiFi-only" phone. After that, the three of them drove up to Denbigh and then to the area of the apartments near "Hot Pot" (note that Hot Pot is approximately 300 feet from NFCU) because Williams told him he needed to get some money and had to do a quick job. Joffrion said he believed it to be work-related, as Williams was wearing his "painters mask" around his head when he exited the car. Joffrion said that Williams was only gone for "seconds," and when he came back, he told them to "go go go" and that "I'll shoot everyone." Joffrion said Williams had a gun in his hand, and Joffrion saw that Williams had money. He said that Williams had been acting abnormal the entire day and had made statements indicating that he was suicidal and that the cops would have to shoot him.

55.    NNPD obtained a search warrant for the 2013 red Cadillac. The following items were seized from the vehicle: Deoxyribonucleic acid (DNA) swabs, a magazine containing 11 Blazer 9mm Luger cartridges from the center console of the vehicle, an iPhone with a pink and teal case, an iPhone with a black and grey case, money trackers inside a coffee cup that contained liquid (the coffee cup was inside the front passenger door panel where Butts had been sitting in the vehicle), a GPS tracker, a bullet from the front passenger seat, a license plate from the front floorboard of the passenger seat (TTM-5170), a long-sleeved navy blue shirt, a 9mm Luger cartridge from the rear right passenger floorboard, white sneakers, a license plate from cargo area (TTM-5170), a plastic bag from rear seat containing cash, $4,980 in U.S. currency and a GPS tracking device from the rear seat, loose cash on the seat, three walkie talkies, and latent prints.

56.    Williams's cell phone was not found in the Cadillac, and Williams did not have his phone in his possession when he was transported to the hospital.

57.    That same day, on July 27, 2024, an individual filed a report with NNPD that his temporary license plate "33067R" was stolen off of his 2011 Chevrolet.

58.    Video footage was obtained from Crossings Court, which showed the 2013 Cadillac pull into the apartment complex on July 27, 2024, at approximately 1128 hours, and drive through the parking lot, until coming to a stop in the area of 494 Crossing Court, behind a black Chevrolet. The rear passenger then exited the vehicle and took the temporary license plate off of the vehicle. That individual, who appeared to be Williams, then got back into the Cadillac with the stolen license plate. The Cadillac left the apartment complex at 1133 hours. The vehicle then hit on the license plate reader located at Denbigh Boulevard and

12

Pocahontas Drive, with the temporary license plate affixed to the rear of the vehicle and no front license plate.

59.    On August 1, 2024, social media accounts for Martel Joffrion, Stephen Allan Williams, and Dominque Butts, including the **SUBJECT ACCOUNTS**, were identified through their disclosed cell phone numbers. Screenshots of their social media accounts show individuals matching the appearance of the subjects. Specifically, Facebook Account ID: 100012828217918, User Name: martel.joffrion, was found to be associated with Joffrion; Facebook Account ID: 100056185143046, User Name: dom.odom.509, was found to be associated with Butts; and Facebook Account ID: 100008636740057, User Name: stephenallan.williams.5, was found to be associated with Williams.

60.    On August 1, 2024, Meta was served with a preservation request pursuant to 18 U.S.C. § 2703(f), requiring it to preserve all information associated with the **SUBJECT ACCOUNTS**.

## CONCLUSION

61.    Based upon the facts set forth above, I submit that probable cause exists to believe that the users of the **SUBJECT ACCOUNTS** have violated 18 U.S.C. § 2113, which prohibits the taking of money from any financial institution by use of violence, force, or intimidation, and conspiracy to commit the same, under 18 U.S.C. § 371.

62.    I further submit that probable cause exists to believe that evidence, fruits, and instrumentalities of such violations will be found within the information associated with these Facebook accounts.

63.    Accordingly, I respectfully request the issuance of a search warrant directed to Meta authorizing the search and seizure of information, records, and stored electronic communications relating to the following Facebook accounts:

    1)    Account ID: 100012828217918, User Name: martel.joffrion
    2)    Account ID: 100056185143046, User Name: dom.odom.509
    3)    Account ID: 100008636740057, User Name: stephenallan.williams.5

64.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

65.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required

13

for the service or execution of this warrant. Meta accepts out-of-state and out-of-district service of subpoenas, court orders, and search warrants by use of their online submission service without the presence of a law enforcement officer. Accordingly, your Affiant will execute the requested search warrant by use of their online submission service to the custodian of records at Meta, and permission is requested for the data to be copied/obtained outside of the presence of a law enforcement officer. It is anticipated that Meta will produce the requested records in electronic format accompanied by a signed authentication letter via e-mail or on electronic media via U.S. Mail to your Affiant. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Zachary Mullin
Special Agent
Safe Streets Peninsula Task Force
Federal Bureau of Investigation

This Affidavit has been reviewed for legal sufficiency by Special Assistant United States Attorney Alyson Yates.

Reviewed: _____

Alyson Yates
Special Assistant United States Attorney

Subscribed and sworn to before me this 6th day of September 2024, in the City of Norfolk, Virginia.

Hon. Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

14

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook User Identifiers:

1. Account ID: 100012828217918, User Name: martel.joffrion
2. Account ID: 100056185143046, User Name: dom.odom.509
3. Account ID: 100008636740057, User Name: stephenallan.williams.5

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to Be Seized

**I.      Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the Facebook User Identifiers listed in Attachment A:

(a)     Any and all pictures/videos, including visual depictions of sent and/or received files of visual depictions. All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them from **May 1, 2024, through present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **May 1, 2024, through present**.

(c)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

(d)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string.

(e)     Messages, read or unread, maintained within the account, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages if available, the destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message, and any non-text or multimedia content sent with the messages; photos, videos, comments, and location information, including "check ins," between **May 1, 2024, through present**. All other communications and messages made or received by the user, from **May 1, 2024, through present** including all private messages and pending "Friend" requests, and all messages, saved, drafted, or in the inbox contained in Facebook Messenger.

(f)     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the Internet Protocol ("IP") address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account

number), and any other records or information pertaining to the accounts; all information about the user's access and use of Facebook Marketplace.

(g)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked."

(h)     All information about the Facebook pages of which the account is or was a "fan."

(i)     All records of Facebook searches performed by the account from **May 1, 2024, through present**.

(j)     The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number).

(k)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account.

(l)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account).

(m)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(n)     Contacts list between **May 1, 2024, through present**.

(o)     "Invite Friends" information, if available, between **May 1, 2024, through present**.

(p)    Log file information reported by the browser, including, but not limited to, web request, IP address, browser type, referring/exit pages and URLS, number of clicks and how the user interacted with links on Instagram and Facebook, domain names, landing pages, pages viewed, and other information between **May 1, 2024, through present**.

(q)    All records or other information stored at any time by any individual using the account, including past and present contact and friend lists, calendar data, pictures, telephone numbers, physical addresses, to-do lists, links to other messages, websites, emails, or internet addresses, and other files.

Meta is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2113, and conspiracy to commit the same, in violation of 18 U.S.C. § 371, involving Martel Lammond Joffrion, Dominique Shante Butts, and/or Stephen Allan Williams, since May 1, 2024, through present, including, for each Facebook User Identifier identified on Attachment A, information pertaining to the following matters:

(a) Evidence of bank robbery, in violation of 18 U.S.C. § 2113, and conspiracy to commit the same, in violation of 18 U.S.C. § 371.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner.

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation.

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.